RECEIVED
SEP - 4 2026
U. S. DISTRICT COURT
EASTERN DISTRICT OF MO
ST. LOUIS

**IN THE UNITED STATES DISTRICT COURT**

**EASTERN MISSOURI**

PAUL BERRY III,

Division: ____

Plaintiff,

v.

4:26-cv-01419 ZMB

DENNY HOSKINS,
in his official capacity as
Missouri Secretary of State,

**Three-Judge Panel Requested**
**28 U.S.C. § 2284(a)**

Defendants.

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiff, Paul Berry III, and upon knowledge with respect to information, hereby allege for this Complaint for Declaratory and Injunctive Relief against Defendants, Missouri Secretary of State Denny Hoskins, in his official capacity as the Secretary of State of the State of Missouri, related to violations of the Voting Rights Act of 2006, and the Fourteenth and Fifteenth Amendments of the United States Constitution, state as follows:

**INTRODUCTION**

After 4:00pm on September 4, 2026, the Missouri Supreme Court completed its administrative review of the certificate of insufficiently issued by the Missouri Secretary of State attached to a Missouri referendum petition related to the Missouri congressional map

utilized by the Missouri Secretary of State to conduct the 2026 Missouri Primary congressional election, and upon such administrative review of the certificate of insufficiently issued by the Missouri Secretary of State, the Missouri Supreme Court issued its opinion and order that the complete filing of the Missouri referendum petition before the Missouri Secretary of State was sufficient, and as a result, (a) the complete filing of the Missouri referendum petition before the Missouri Secretary of State suspended the Missouri congressional map utilized by the Missouri Secretary of State to conduct the 2026 Missouri Primary congressional election retroactively to December 9, 2025, and (b) the Missouri statute enacting the suspension of he Missouri congressional map utilized by the Missouri Secretary of State to conduct the 2026 Missouri Primary congressional election also suspended the repeal of the previous Missouri congressional map, which is now ordered by the Missouri Supreme Court to be utilized by the Missouri Secretary of State to conduct the 2026 Missouri General congressional election until a Missouri statewide vote has been conducted by the Missouri Secretary of State during the 2026 Missouri General election.

The graveman of the underlying Complaint is the previous Missouri congressional map enacted by the Missouri Supreme Court ordering the certification of the Missouri referendum petition is for a plethora of reasons further explained by *LOUISIANA v. CALLAIS ET AL.* and this Complaint grossly violates United States Code and the United States Constitution. No Missouri Court has considered the constitutionality of Missouri utilizing race to draft the jurisdictional boundaries of Missouri Congressional District One as a majority-Miority

gerrymandered congressional district under the Gingles analysis, as amended by *LOUISIANA v. CALLAIS ET AL.* and there was no cause to invalidate an unconstitutional congressional map that was neither utilized to conduct the 2026 Missouri Primary congressional election or was not even Missouri law until 4:00pm yesterday.

The "hard deck" deadline for Missouri to enact a constitutional Missouri congressional district map is September 19, 2026, minus any time for Missouri election officials to prepare absentee ballots for mail to United States Armed Service members 45 days prior to the 2026 Missouri General congressional election set for November 3, 2026. The Missouri General Assembly has shown around this time last year their ability to enact a Missouri congressional district map with six (6) of engagement in a Missouri special legislative session. Missouri should be provided a very limited opportunity to cure its unconstitutional use of the current Missouri congressional district map enacted yesterday and after the 2026 Missouri Primary congressional election prior to the Court enacting a Missouri congressional district map for use during the 2026 Missouri General congressional election.

Last, on an un-expedited basis the Complaint seeks to strike the portion of the Missouri Plan Act which has been enacted in Missouri since 1940 that as applied by Missouri unconstitutionally abridges 88% of the African American voters in Missouri from ballot elections of associate circuit court and circuit court judges, a desperate impact upon African American voters in Missouri without any purported compelling state interest that services the Court's strict scrutiny analysis in the manner provided by Federal case law.

## PARTIES

1. Plaintiff Paul Berry III ("Plaintiff Berry") is an African American resident of Missouri over the age of twenty-one years old and a registered voter of Missouri Congressional District One. Plaintiff Berry is the certified Missouri Congressional District One Republican nominee for the 2026 Missouri General congressional election. Plaintiff Berry voted during the 2026 Missouri Primary congressional election and intends to vote during the 2026 Missouri General congressional election.

2. Defendant Denny Hoskins ("Defendant", "Missouri", or "Missouri Secretary of State") is the current Secretary of State of the State of Missouri. The foundational Missouri constitutional authority establishing the election duties of the Missouri Secretary of State lies with Article IV, Section 14 of the Missouri Constitution, which states:

> "The secretary of state shall be custodian of the seal of the state, and authenticate therewith all official acts of the governor except the approval of laws. The seal shall be called the "Great Seal of the State of Missouri," and its present emblems and devices shall not be subject to change. He shall keep a register of the official acts of the governor, attest them when necessary, and when required shall lay copies thereof, and of all papers relative thereto, before either house of the general assembly. He shall be custodian of such records, and documents and perform such duties in relation thereto, and in relation to elections and corporations, as provided by law, but no duty shall be imposed on him by law which is not related to his duties as prescribed in this constitution." (underline added)

3. The Missouri Secretary of State conducted the 2026 Missouri Primary congressional election and intends on conducting the 2026 Missouri General congressional election for Missouri Congressional District One on behalf of the State of Missouri.

## JURISDICTION AND VENUE

4. This Court maintains jurisdiction upon the underlying Complaint pursuant to 42 U.S.C. § 1983, 42 U.S.C. § 1988, 28 U.S.C. § 1331, 28 U.S.C. 1343(a)(3) and 28 U.S.C. 1343(a)(4).

5. This Court maintains jurisdiction to issue declaratory and injunctive relief related to the underlying Complaint pursuant to 28 U.S.C. § 2201 and 28 U.S.C. § 2202.

6. Venue related to the underlying Complaint is proper because the current and former boundaries of Missouri Congressional District One are wholly encompassed within the jurisdictional boundaries of the Court and Plaintiff Paul Berry III: (a) resides within Missouri Congressional District One, (b) voted during the 2026 Missouri Primary congressional election for Missouri Congressional District One and (c) intends to vote during the 2026 Missouri General congressional election for Missouri Congressional District One. (see 28 U.S.C. § 1391(b)(2))

7. Venue related to the underlying Complaint is proper because the current and former boundaries of Missouri Congressional District One are wholly encompassed within the jurisdictional boundaries of the Court and Defendant Missouri Secretary of State: (a) maintains an office within Missouri Congressional District One, (b) conducted the 2026 Missouri Primary congressional election for Missouri Congressional District One wholly within the jurisdiction of this Court and (c) intends to conduct the 2026 Missouri General congressional election for Missouri Congressional District One wholly within the jurisdiction of this Court. (see 28 U.S.C. § 1391(b)(2))

**THREE-JUDGE COURT REQUESTED**

8. This Complaint challenges the constitutionality of the 2022 Missouri congressional map being utilized by the State of Missouri to conduct the 2026 Missouri General congressional election set for November 3, 2026. 28 U.S.C. § 2284(a) provides that "[a] district court of three judges shall be convened . . when an action is filed challenging the constitutionality of the apportionment of congressional districts or the apportionment of any statewide legislative body', and as such, Plaintiff Berry respectfully request that the Court "immediately notify the chief judge of the circuit" so that the Chief Judge may "designate two other judges, at least one of whom shall be a circuit judge," to "serve as members of the court to hear and determine th[is] action." 28 U.S.C. § 2284(b)(1).

9. When adjudicating the challenge of a congressional map pursuant to 28 U.S.C. § 2284, the Supreme Court has indicated that a three-judge court could properly consider a statutory challenge "and grant relief in the exercise of jurisdiction ancillary to that conferred by the constitutional attack on the state statutes which plainly required a three-judge court." Allee v. Medrano, 416 U.S. 802, 812 (1974).

10. Further, a court can exercise ancillary jurisdiction when the "claims . . . are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy." 28 U.S.C. § 1367(a), such as restraining Defendants from violating statutory and constitutional election laws.

**STATEMENT OF VERIFIED FACTS**

11. Article I, Section 4, Clause 1 of the United States Constitution (the "Elections Clause"),

grants each State within the Union, such as the State of Missouri, the authority to set "(t)he Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators."

12. Authorized by the Elections Clause, 2 U.S.C. § 7 requires Missouri and all other States of the Union to conduct a General election for United States Congress on the "Tuesday next after the 1st Monday in November, in every even numbered year."

13. 2 U.S.C. § 7 requires Missouri to conduct a General election for United States Congress on Tuesday November 3, 2026.

14. Authorized by the Elections Clause, 2 U.S.C. § 2c requires Missouri after "the Ninety-first Congress or in any subsequent Congress thereafter to more than one Representative under an apportionment made pursuant to the provisions of section 2a(a) of this title, there shall be established by law a number of districts equal to the number of Representatives to which such State is so entitled, and Representatives shall be elected only from districts so established, no district to elect more than one Representative (except that a State which is entitled to more than one Representative and which has in all previous elections elected its Representatives at Large may elect its Representatives at Large to the Ninety-first Congress)."

15. 2 U.S.C. § 2c requires Missouri to create a congressional district map for use during the 2026 Missouri General congressional election by establishing "by law a number of districts

equal to the number of Representatives to which such State is so entitled, and Representatives shall be elected only from districts so established".

16. Authorized by the Elections Clause, 2 U.S. Code § 2a establishes the process for the United States to appoint the number of congressional districts Missouri is required to maintain upon Missouri's current congressional district map codified by Missouri law.

17. Authorized by the Elections Clause, Article III, Section 45 of the Missouri Constitution requires Missouri to create a congressional district map for use during the Missouri 2026 General election and states:

> "Congressional apportionment. — When the number of representatives to which the state is entitled in the House of the Congress of the United States under the census of 1950 and each census thereafter is certified to the governor, the general assembly shall by law divide the state into districts corresponding with the number of representatives to which it is entitled, which districts shall be composed of contiguous territory as compact and as nearly equal in population as may be."

18. United States congressional districts in Missouri are enacted by "the general assembly shall by law divide the state into districts corresponding with the number of representatives to which it is entitled..", in the same general manner and under the same legislative procedure as enacting any other Missouri statute.

19. On August 12, 2021, the US Census Bureau published the detailed local redistricting data files from the decennial census canvas and its reapportionment calculations pursuant to 2 U.S. Code § 2a, 2 U.S. Code § 2c and the Elections Clause.

20. Based upon Article III, Section 45 of the Missouri Constitution, 2 U.S. Code § 2a, 2

U.S. Code § 2c and the Elections Clause, no Missouri congressional district map enacted prior to August 12, 2021, may be utilized by Missouri to conduct the 2026 Missouri General congressional election.

21. There are only two Missouri congressional district maps that were enacted by Missouri after August 12, 2021, that theoretically could be utilized by the Missouri Secretary of State to conduct the 2026 Missouri General congressional election that would not cause Missouri to violate Article III, Section 45 of the Missouri Constitution, 2 U.S. Code § 2a and 2 U.S. Code § 2c that were enacted by Missouri since the US Census Bureau published the detailed local redistricting data files from the decennial census canvas and its reapportionment calculations on August 12, 2021, which include: (a) House Bill 2909 enacted by Missouri on May 18, 2022, and (b) House Bill 1 enacted by Missouri on August 9, 2025 (the "Missouri Congressional District Maps").

**Missouri 2022 Congressional District Map**

22. On March 1, 2022, former Missouri House of Representative Dan Shaul introduced House Bill 2909 entitled: "AN ACT To repeal sections 128.345, 128.346, and 128.348, RSMo, and to enact in lieu thereof twelve new sections relating to the composition of congressional districts, with an emergency clause."

23. On May 9, 2022, the Missouri House of Representatives passed House Bill 2909 by a vote of 101 Ayes to 47 Noes. The Emergency Clause attached to House Bill 2909 passed by the Missouri House of Representatives by a vote of 114 Ayes to 34 Noes.

24. On May 11, 2022, the Missouri Senate passed House Bill 2909 by a vote of 22 Ayes to 11 Noes. The Emergency Clause attached to House Bill 2909 passed by the Missouri Senate by a vote of 29 Ayes to 4 Noes.

25. On May 18, 2022, House Bill 2909 was delivered to Missouri Governor Mike Parson and was signed into law by Governor Parson on the same day.

26. House Bill 2909 was signed into Missouri law by Governor Parson with the Emergency Clause attached and went into immediate effect on May 18, 2022.

27. Missouri utilized the Missouri congressional district map created from the enactment of House Bill 2909 to conduct the 2022 and 2024 Missouri congressional election cycle.

**Missouri 2025 Congressional District Map**

28. On August 29, 2025, Missouri Governor Michael Kehoe issued a Proclamation convening an extraordinary session of the Missouri General Assembly pursuant to Article IV, Section 9 of the Missouri Constitution set to commence on September 3, 2025: "(t)o enact legislation to establish new congressional districts for the State of Missouri."

29. On September 3, 2025, former Missouri House of Representative Dirk Deaton introduced House Bill 1 entitled: "An Act To repeal sections 128.345, and 128.348, RSMo, and to enact in lieu thereof twelve new sections relating to the composition of congressional districts."

30. On September 3, 2025, the Missouri House of Representatives passed House Bill 1 by a vote of 90 Ayes to 65 Noes. No Emergency Clause was attached to House Bill 1 upon passage

by the Missouri House of Representatives.

31. On September 9, 2025, the Missouri Senate passed House Bill 1 by a vote of 21 Ayes to 11 Noes. No Emergency Clause was attached to House Bill 1 upon passage by the Missouri Senate.

32. On September 9, 2025, House Bill 1 was delivered to and signed into Missouri law by Missouri Governor Kehoe without any Emergency Clause.

33. Article III, Section 29 of the Missouri Constitution establishes when an enacted Missouri law goes into effect, which states:

> "Effective date of laws — exceptions — procedure in emergencies and upon recess. — No law passed by the general assembly, except an appropriation act, shall take effect until ninety days after the adjournment of the session in either odd-numbered or even-numbered years at which it was enacted. However, in case of an emergency which must be expressed in the preamble or in the body of the act, the general assembly by a two-thirds vote of the members elected to each house, taken by yeas and nays may otherwise direct; and further except that, if the general assembly recesses for thirty days or more it may prescribe by joint resolution that laws previously passed and not effective shall take effect ninety days from the beginning of the recess."

34. House Bill 1 went into effect in Missouri on December 11, 2025.

35. As of December 11, 2025, House Bill 1 repealed the 2022 Missouri Congressional District Map enacted by House Bill 2909 by Missouri on May 18, 2022.

36. Missouri utilized the Missouri congressional district map created from the enactment of House Bill 1 to conduct the 2026 Missouri congressional Primary election on August 4, 2026.

**Missouri House Bill 1 Referendum**

37. House Bill 1 enacted on September 9, 2025, was codified as Missouri law as § 128.345, 128.346, 128.348, and 128.471 through 128.479 RSMo, with an effective date of December 11,

2025.

38. Article III, Section 49 of the Missouri Constitution establishes the right to referendum petitions against any law enacted by Missouri, which states:

> "Reservation of power to enact and reject laws. — The people reserve power to propose and enact or reject laws and amendments to the constitution by the initiative, independent of the general assembly, and also reserve power to approve or reject by referendum any act of the general assembly, except as hereinafter provided."

39. Article III, Section 52 (a) of the Missouri Constitution establishes procedures related to referendum petitions, which states:

> "Referendum — exceptions — procedure. — A referendum may be ordered (except as to laws necessary for the immediate preservation of the public peace, health or safety, and laws making appropriations for the current expenses of the state government, for the maintenance of state institutions and for the support of public schools) either by petitions signed by five percent of the legal voters in each of two-thirds of the congressional districts in the state, or by the general assembly, as other bills are enacted. Referendum petitions shall be filed with the secretary of state not more than ninety days after the final adjournment of the session of the general assembly which passed the bill on which the referendum is demanded."

40. Article III, Section 52 (b) of the Missouri Constitution further establishes procedures related to referendum petitions, which states:

> "The veto power of the governor shall not extend to measures referred to the people. All elections on measures referred to the people shall be had at the general state elections, except when the general assembly shall order a special election. Any measure referred to the people shall take effect when approved by a majority of the votes cast thereon, and not otherwise. This section shall not be construed to deprive any member of the general assembly of the right to introduce any measure."

41. On September 29, 2025, Richard von Glahn ("Missouri House Bill 1 Referendum Organizer") filed a referendum petition ("Missouri House Bill 1 Referendum") assigned Missouri Referendum Petition Number 2026-R004.

42. A true and correct copy of House Bill 1 enacted by Missouri on August 9, 2025, was attached to Missouri House Bill 1 Referendum filed by Missouri House Bill 1 Referendum Organizer before the Missouri Secretary of State on September 29, 2025.

43. The website of the Missouri Secretary of State publishes that the ballot language for Missouri House Bill 1 Referendum was approved by the Missouri Secretary of State on May 13, 2025, (Plaintiff Berry humbly suggests the aforementioned date of May 13, 2025, is a simple clerical error and should state November 13, 2025) certifying the following referendum petition language for distribution to Missouri voters:

> "Do the people of the state of Missouri approve the act of the General Assembly entitled "House Bill No. 1 (2025 Second Extraordinary Session)," which repeals Missouri's existing congressional plan, and replaces it with new congressional boundaries that keep more counties intact?"

44. On December 9, 2025, Missouri House Bill 1 Referendum Organizer submitted 691 boxes of purported voter referendum petitions to the Missouri Secretary two (2) days prior to the effective date of Missouri House Bill 1.

45. Missouri House Bill 1 Referendum Organizer vigorously argued before the Missouri courts that simply turning in a several hundreds boxes of unverified voter referendum petitions can somehow suspend the enactment of Missouri House Bill 1 prior to the Missouri Secretary of State verifying the voter signatures attached to such unverified voter referendum petitions in the manner required by Missouri law, which was soundly rejected by the Missouri Supreme Court in *Maggard v. State* (Mo Supreme Court- 2026).

46. *Maggard v. State* affirmed the date of August 4, 2026, as the Missouri statutory deadline for the Missouri Secretary of State to issue a certification decision regarding whether the voter signatures submitted to the Missouri Secretary of State on December 9, 2025, attached to Missouri House Bill 1 Referendum are sufficient pursuant to Article III, Section 52 (a) of the Missouri Constitution to place Missouri House Bill 1 Referendum on the 2026 Missouri General election ballot.

47. On August 4, 2026, the Missouri Secretary of State issued a certificate of insufficiency against the voter signatures attached to Missouri House Bill 1 Referendum pursuant to § 116.150, RSMo.

48. Judicial review of the Missouri Secretary of State's decision to issue a certificate of insufficiency against the voter signatures attached to Missouri House Bill 1 Referendum pursuant to § 116.150, RSMo is permissible by Missouri law pursuant to § 116.200, RSMo when filed within ten (10) days of such decision by the Missouri Secretary of State to issue a certificate of insufficiency against the voter signatures attached to Missouri House Bill 1 Referendum, which states:

> "1. After the secretary of state certifies a petition as sufficient or insufficient, any citizen may apply to the circuit court of Cole County to compel him to reverse his decision. The action must be brought within ten days after the certification is made. All such suits shall be advanced on the court docket and heard and decided by the court as quickly as possible.
>
> 2. If the court decides the petition is sufficient, the secretary of state shall certify it as sufficient and attach a copy of the judgment. If the court decides the petition is insufficient, the court shall enjoin the secretary of state from certifying the measure and all other officers from printing the measure on the ballot.

> 3. Within ten days after a decision is rendered, any party may appeal it to the supreme court."

49. On August 4, 2026, Missouri House Bill 1 Referendum Organizer filed a declaratory judgment and injunctive relief petition before the Cole County Circuit Court of the State of Missouri (Missouri Circuit Court Case No: 26AC-CC00440 - "*VON GLAHN V HOSKINS*") pursuant to, inter alia, § 116.200.1, RSMo seeking the Cole County Circuit Court to adjudicate by de novo judicial review as to whether Missouri House Bill 1 Referendum is sufficient or insufficient for placement on the 2026 Missouri General election ballot pursuant to § 116.115, RSMo, which states:

> "1. After the secretary of state makes a determination on the sufficiency of the petition and if the secretary of state finds it sufficient, the secretary of state shall issue a certificate setting forth that the petition contains a sufficient number of valid signatures to comply with the Constitution of Missouri and with this chapter.
>
> 2. The secretary of state shall issue a certificate only for a petition approved pursuant to section 116.332. If the secretary of state finds the petition insufficient, the secretary of state shall issue a certificate stating the reason for the insufficiency.
>
> 3. The secretary of state shall issue a certificate pursuant to this section not later than 5:00 p.m. on the thirteenth Tuesday prior to the general election or two weeks after the date the election authority certifies the results of a petition verification pursuant to subsection 2 of section 116.130, whichever is later."

50. On August 10, 2026, the Presiding Judge of the Missouri Supreme Court issued a letter sua sponte to the Cole County Circuit Court stating, inter alia, that the adjudication of *VON GLAHN V HOSKINS* (a) has relevance to which Missouri congressional district map that will be lawfully enacted and utilized by the Missouri Secretary of State to conduct the 2026 Missouri General congressional, (b) is required to be docketed and heard at the first

opportunity of the Cole County Circuit Court, (c) the strong likelihood that *VON GLAHN V HOSKINS* will be appealed to the Missouri Supreme Court and (d) the necessity of *VON GLAHN V HOSKINS* to be finally resolved by the Missouri courts no later than September 8, 2026, as to not interfere with ballot preparation for the 2026 Missouri General congressional election.

51. The Cole County Circuit Court set *VON GLAHN V HOSKINS* for bench trial on August 19, 2026.

52. On August 19, 2026, the Cole County Circuit Court issued its decision in *VON GLAHN V HOSKINS*, with the following court docket text order:

> "WHEREFORE, this Court hereby issues its Judgment and Order in favor of Defendant Denny Hoskins and Intervenors Republican National Committee, National Republican Congressional Committee, and Missouri Republican State Committee and against Plaintiff on Plaintiffs Petition for Declaratory Judgment and Injunctive Relief and further ORDERS, DECLARES, and ADJUDGES that: A. Missouri's referendum provisions in Article III, Sections 49 and 52 of the Missouri Constitution do not apply to congressional redistricting enacted by the General Assembly pursuant to Article III, Section 45; B. The Secretary of State's decision to not certify the referendum petition directed at HB 1 was lawful; C. HB 1 remains in full force and effect for the 2026 general election; D. The Petition is dismissed and judgment is entered for Defendant; E. The parties are to bear their own costs. F. As soon as a notice of appeal is filed, if any, this Court relinquishes its jurisdiction over this matter and deems this Judgment final for purposes of appeal. See Rule 81.045. SO ORDERED, this 19th day of August 2026. DRG/ado"

53. On August 19, 2026, a notice of appeal was filed before the Cole County Circuit Court in *VON GLAHN V HOSKINS* by Missouri House Bill 1 Referendum Organizer, to which, on August 20, 2026, the Missouri Supreme Court issued the following court docket text order:

> "Order issued: On August 19, 2026, Appellant filed a notice of appeal to this Court. Without determining whether this appeal invokes this Court's exclusive appellate

> jurisdiction, this Court, on its own motion, grants transfer of this case under Rule 83.01 because of the general interest or importance of the legal issues involved in this matter. An expedited briefing schedule is set as follows: The legal file and transcript are due on or before August 24, 2026; Appellant's brief is due on or before 12:00 p.m., August 25, 2026; Respondents' briefs are due on or before 12:00 p.m., August 27, 2026; and Appellant's reply brief, if any, is due on or before 12:00 p.m., August 31, 2026. This matter will be set for oral argument on September 2, 2026."

54. On September 2, 2026, *VON GLAHN V HOSKINS* was argued before and submitted for decision by the Missouri Supreme Court.

55. On September 3, 2026, the Missouri Supreme Court issued its opinion in *VON GLAHN V HOSKINS*, which states, inter alia, that House Bill 1 (2025) that established the 2025 Missouri Congressional District Map is suspended until a statewide referendum vote is conducted by the Missouri Secretary of State during the 2026 General election and because House Bill 1 (2025) repealed House Bill House Bill 2909 (2022) that the Missouri congressional district map that was established by House Bill 2909 (2022) is in effect for the 2026 Missouri General congressional election.

**Unconstitutional Collateral Effects of Missouri House Bill 1 Referendum**

56. The Missouri Supreme Court in *Maggard v. State* addressed the application of Article III, Sections 29, 49, 52(a) and 52 (b) of the Missouri Constitution upon House Bill 1 enacted on August 9, 2025, which states:

> "If the December 9 referendum petition filing is ultimately determined to be insufficient, HB 1 became the law on December 11 under article III, section 29 because no "legal, sufficient, and timely" referendum petition was filed before expiration of the 90-day period in article III, section 52(a). See State ex rel. Moore v. Toberman, 250 S.W.2d 701, 703, 705-07 (Mo. banc 1952) (affirming a circuit court judgment concluding a law took effect 90 days after recess of the session in which it was enacted under article III, section 29 when only an insufficient referendum petition had been

filed before the 90 days expired because the referendum petition deficiencies could not be remedied by a supplemental filing beyond the time limits in article III, sections 29 and 52(a)).

If, however, the December 9 referendum petition filing is ultimately determined to be sufficient, article III, section 52(b) applies. In that case, because a "legal, sufficient, and timely" referendum petition was filed on December 9 — before HB 1 went into effect on December 11 — HB 1 did not take effect on December 11, HB 1 was "referred to the people" as of December 9, and HB 1 "shall take effect when approved by a majority of the votes cast thereon, and not otherwise." Mo. Const. art. III, sec. 52(b)." (underline added)

57. Under the legislative mechanics of Article III, Sections 29, 49, 52(a) and 52 (b) of the Missouri Constitution, and as explained by the Missouri Supreme Court in *VON GLAHN V HOSKINS*, House Bill 1 not being in effect during the 2026 Missouri General congressional election now immediately causes the 2022 Missouri Congressional District Map to become the statutory Missouri congressional district map during the 2026 Missouri General congressional Election, which now provides Plaintiff Berry virtually zero notice or opportunity to seek judicial relief before this three-Judge Court prior to September 8, 2026.

58. Plaintiff Berry does not seek to challenge the legality of the Missouri House Bill 1 Referendum, in itself, or take any position before the Court regarding the legality of utilizing Missouri's referendum process to repeal any Missouri congressional district map; Plaintiff Berry's underlying Complaint related to the Missouri House Bill 1 Referendum is solely limited to prohibiting Missouri from utilizing the 2022 Missouri Congressional District Map, which will cause Missouri to commit a demonstrative violation of Section 2 of the Voting Rights Act and the Fourteenth and Fifteenth Amendments of the United States Constitution, in the same manner as recently explained by the United States Supreme Court in *LOUISIANA v.*

*CALLAIS ET AL.*, and as such, the Missouri Secretary of State will violate the United States Constitution because the Missouri Supreme Court compels the Missouri Secretary of State to conduct the Missouri 2026 General congressional election utilizing the grossly unconstitutional 2022 Missouri Congressional District Map.

**Missouri's election laws as applied and on their face violate the Voting Rights Act of 2006 and constitute substantial violations of the Civil War Amendments of the United States Constitution.**

**A. Historical background related to African American citizens of the United States and the Civil War Amendments of the United States Constitution.**

59. The right to live as a free man without being bound by unjust personal servitude regardless of the skin color or race of such free man is not simply a right "granted" by the United States of America; the right to personal freedom regardless of skin color or race is a cornerstone inalienable right of all men that is granted by GOD.

60. Establishing the foundation of a Republic nation requires both the acknowledgment and protection of cornerstone inalienable rights granted by GOD, which stands as antithetical to a monarchy form of government vehemently opposed by the Founders.

61. *We The People* by our elected representatives of the founding territories, which included representation of African Americans who enjoyed the right to suffrage, agreed upon the formation of the United States of America by ratification of the United States Constitution on March 4, 1789.

62. As explained by the dissenting opinion from United States Supreme Court Justice

Benjamin Curtis in *Dred Scott v. Sandford*, the Framers vigorously considered and rejected the concept of enacting the Articles of Confederation with constitutional rights only applicable to White persons or denial of the same constitutional rights to free African Americans, which states:

> ". . . On the 25th of June, 1778, the Articles of Confederation being under consideration by the Congress, the delegates from South Carolina moved to amend this fourth article by inserting after the word "free," and before the word "inhabitants," the word "white," so that the privileges and immunities of general citizenship would be secured only to white persons.[8] Two states voted for the amendment, eight states against it, and the vote of one state was divided. The language of the article stood unchanged, and both by its terms of inclusion, "free inhabitants," and the strong implication from its terms of exclusion, "paupers, vagabonds, and fugitives from justice," who alone were excepted, it is clear that under the Confederation, and at the time of the adoption of the Constitution, free colored persons of African descent might be, and, by reason of their citizenship in certain states, were, entitled to the privileges and immunities of general citizenship of the United States. . . .
>
> I can find nothing in the Constitution which, proprio vigore,[9] deprives of their citizenship any class of persons who were citizens of the United States at the time of its adoption, or who should be native-born citizens of any state after its adoption, nor any power enabling Congress to disfranchise persons born on the soil of any state, and entitled to citizenship of such state by its constitution and laws. And my opinion is that, under the Constitution of the United States, every free person born on the soil of a state, who is a citizen of that state by force of its constitution or laws, is also a citizen of the United States....
>
> It has been often asserted that the Constitution was made exclusively by and for the white race. It has already been shown that, in five of the thirteen original states, colored persons then possessed the elective franchise, and were among those by whom the Constitution was ordained and established. If so, it is not true, in point of fact, that the Constitution was made exclusively by the white race. And that it was made exclusively for the white race is, in my opinion, not only an assumption not warranted by anything in the Constitution, but contradicted by its opening declaration that it was ordained and established by the people of the United States, for themselves and their posterity. And as free colored persons were then citizens of at least five states, and so in every sense part of the people of the United States, they were among those for whom and whose posterity the Constitution was ordained and established. . . .

> I dissent, therefore, from that part of the opinion of the majority of the court in which it is held that a person of African descent cannot be a citizen of the United States, and I regret I must go further and dissent both from what I deem their assumption of authority to examine the constitutionality of the act of Congress commonly called the Missouri Compromise Act and the grounds and conclusions announced in their opinion. . . ."

63. In the original language of the United States Constitution, a distinction was established between the congressional representation appropriation related to the United States House of Representatives regarding African Americans who endured un-Godly bondage under a system known as slavery and African Americans who were deemed free persons, which provided for the purposes of congressional representation appropriation related to the United States House of Representatives that slaves would only be counted as three-fifths of a free man, and also provided that African Americans who are deemed free persons were to be counted as whole persons for the purpose of congressional representation appropriation related to the United States House of Representatives.

64. There is no provision in the original United States Constitution which directly prohibited any African American from voting for or serving as a United States Representative, Senator or President, any candidate or voter prohibitions related to African Americans were based upon either local and state laws or shadow election discrimination practices predicated on denying African Americans meaningful involvement in the function of our Nation's government system.

65. Despite the original United States Constitution not prohibiting African Americans from serving as Federal political candidates or voting in Federal elections, a plethora of Federal case

law routinely found states of the Union were not prohibited by the United States Constitution from permitting outright slave ownership of African Americans and the denial of any right to any African American, which cultivated to the point in the year 1857 where the United States Supreme Court's infamous Chief Justice Roger Tanney declared in *Dred Scott v. Sandford* that no African American, free or slave, maintained any standing to seek redress before the Federal court system to bring any claim regarding the United States Constitution because no Black man maintained any right, to which any White man was required to respect.

66. After the election of Abraham Lincoln as President of the United States in 1860, eleven Southern states of the Union purported to abdicate the United States of America to form an independent nation, which resulted in the Southern states of the Union starting the United States Civil War on April 12, 1861, by engaging in an intentional military assault against Fort Sumner in South Carolina.

67. While the cause and reasonings related to any civil war are usually complex and multifaceted, very few United States historians disagree with the proposition that a major catalyst for the American Civil War included the Southern states of the Union seeking an unfettered state right to establish as a matter of law the enslavement of African Americans as property without any humanity or personal rights.

68. As a military recruitment tool and to promote the uprising of enslaved African Americans in the Southern states of the Union, on September 22, 1862, United States President Abraham Lincoln issued his preliminary Emancipation Proclamation order, which inter alia,

declared that any African American deemed in slavery boundage by the Southern states of the Union will be deemed "then, thenceforward, and forever free" by the United States of America if the Southern state of the Union in question did not cease its rebellion against the United States of America within 100 days of execution of the preliminary Emancipation Proclamation order.

69. The Southern states of the Union refused to cease their rebellion against the United State of America within 100 days of United States President Abraham Lincoln's execution of the preliminary Emancipation Proclamation order, and as a result, United States President Abraham Lincoln executed his formal Emancipation Proclamation order on New Years Day 1863, which also lead to 200,000 African Americans being authorized by the Emancipation Proclamation to serve in the United States Armed Service to compel submission of the Southern states of the Union to end their political and military rebellion against the United States of America.

70. While Missouri was a state that domiciled free and enslaved African Americans, slaves were offered at Union military enlistments the promise of freedom by the United States of America at the conclusion of their military enlistment.

71. Leading up to the submission of the Southern states of the Union to the United States of America compelled by the United States Civil War, three amendments to our United States Constitution (the "Civil War Amendments") were drafted to address political questions related to African Americas, which included the Thirteenth, Fourteenth and Fifteenth Amendments of

the United States Constitution.

72. On January 31, 1865, the United States of America under the leadership of Republican President Abraham Lincoln officially enacted the constitution ratification request required to codify the Thirteenth Amendment of the United States Constitution, which was ratified by three-fourths of the states of the Union on December 6, 1865, and provides:

> "Section 1: Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction.
>
> Section 2: Congress shall have power to enforce this article by appropriate legislation."

73. On April 9, 1865, the military leader of the Southern states of the Union surrendered to General Ulysses S. Grant and the United States of America, effectively ending the United States Civil War.

74. On April 14, 1865, United States of America President Abraham Lincoln was shot by a cowardly assassin in retaliation against President Lincoln's leadership to end slavery in all jurisdictions within the United States and died the next morning at 7:22 am eastern standard time.

75. Between the years 1866 and 1870, the Southern states of the Union were individually permitted re-recognition from the United States of America as states of the Union bound by the requirements of the United States Constitution.

76. On July 28, 1868, the United States of America officially enacted the Fourteenth Amendment of the United States Constitution, which states in relevant part:

> "Section 1: All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.
>
> Section 2: Representatives shall be apportioned among the several States according to their respective numbers, counting the whole number of persons in each State, excluding Indians not taxed. But when the right to vote at any election for the choice of electors for President and Vice-President of the United States, Representatives in Congress, the Executive and Judicial officers of a State, or the members of the Legislature thereof, is denied to any of the male inhabitants of such State, being twenty-one years of age, and citizens of the United States, or in any way abridged, except for participation in rebellion, or other crime, the basis of representation therein shall be reduced in the proportion which the number of such male citizens shall bear to the whole number of male citizens twenty-one years of age in such State."

77. On February 3, 1870, the United States of American codified Section One of the Fifteenth Amendment of the United States Constitution, which states:

> "The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude."

78. The United States Civil War caused approximately 750,000 casualties almost solely comprising of American citizens of all races and political ideologies.

79. The codification of the Civil War Amendments within our United States Constitution answered the political questions certified in blood by the death of three-quarters of one million Americans that African Americans are not to be enslaved and are deemed free persons and citizens of the United States of America, are to be provided equal protection from our Nation's government operations and the vote of African Americans shall never be denied or infringed upon by any state of the Union or the United States of America.

80. Due to Missouri's request and admission into the Union as the 24th state jurisdiction on August 10, 1821, and regardless of any provision of the Missouri Compromise Act alleged to the contrary, Missouri maintains no zero legal authority whatsoever to refuse submission to the requirements of the Fourteenth and Fifteenth Amendments to the United States Constitution as a state member of the Union.

81. Plaintiff Berry is a naturally-born citizen of the United States of America who is a male inhabitant of Missouri that is over 21-years old, deemed a free man and is otherwise eligible to vote for and be elected to the United States House of Representatives, and under any interpretation of any version of the United States Constitution, Plaintiff Berry is subject to the constitutional protections provided by the Fourteenth and Fifteenth Amendments of the United States Constitution against Missouri.

82. In response to almost an entire century of various states within the Union committing substantial unconstitutional noncompliance with the requirements of Section One of the Fifteenth Amendment of the United States Constitution targeted against African Americans, the United States Congress enacted the Voting Rights Act of 1964, which established Federal court jurisdiction to seek prohibition against any state of the Union that causes violation of Section One of the Fifteenth Amendment of the United States Constitution.

83. The Voting Rights Act of 1964, and its subsequent amendments thereto, is one of only a few Federal laws that are directly and specifically authorized by our United States Constitution.

84. When applied constitutionally, Plaintiff Berry is a stalwart supporter of the Voting Rights Act of 1964, and each subsequent amendment to the Voting Rights Act of 1964, thereafter.

85. The constitutional authority for the United States Congress to enact and renew any former or current version of the Voting Rights Act derives from Section Two of the Fifteenth Amendment of the United States Constitution, which states: "(t)he Congress shall have power to enforce this article by appropriate legislation."

86. In the alternative, the constitutional authority for the United States Congress to enact and renew any former or current version of the Voting Rights Act derives from Section Five of the Fourteenth Amendment of the United States Constitution, which states: "(t)he Congress shall have power to enforce this article by appropriate legislation", because a violation of Section One of the Fifteenth Amendment of the United States Constitution is also automatically a violation of the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution.

87. Relevant to the underlying Complaint is Section 2(A) of the Fannie Lou Hamer, Rosa Parks, and Coretta Scott King Voting Rights Act Reauthorization and Amendments Act of 2006 (hereafter the "2006 Voting Rights Act"), which reauthorized the Voting Rights Act of 1964 after previous congressional amendments of the Voting Rights Act enacted in the years 1970, 1975, 1982 and 1992, and states:

> "(2) No person acting under color of law shall—

> (A) in determining whether any individual is qualified under State law or laws to vote in any election, apply any standard, practice, or procedure different ' from the standards, practices, or procedures applied under such law or laws to other individuals within the same county, parish, or similar political subdivision who have been found by State officials to be qualified to vote;"

**B. The Missouri Plan, as applied to African American voters of Missouri related to the ballot selection of Missouri judges, violates the Voting Rights Act of 2006 and the Civil War Amendments.**

88. Plaintiff Berry can not fathom a more important differentiation of voting practices that produces a negative suffrage result in comparison to the fact that the vast majority of African Americans in Missouri are prohibited from consolidating their vote to elect the Missouri judiciary of their choice, while their White counterpart communities in Missouri are permitted to nominate and select the Missouri judiciary who represent their similarly situated Missouri county jurisdictions.

89. 70 years after the Fifteenth Amendment was codified in the United States Constitution, in 1940 Missouri voters by initiative petition enacted election procedures pursuant to Article V, Section 29 of the Missouri Constitution, which as applied prohibited virtually all African American residents of Missouri from voting for the Missouri circuit judge candidates of their choice to serve their home Missouri judicial circuit.

90. In 1940, virtually all African American registered voters in Missouri resided in the City of St. Louis and Jackson County.

91. Article V, Section 29 of the Missouri Constitution provided in 1940 that registered voters in Missouri who resided in the City of St. Louis and Jackson County were (and are)

NOT permitted to nominate by ballot election Missouri circuit judges, when Missourians who resided in communities with virtually no African American residents or registered voters were (and are) permitted to nominate by ballot election Missouri circuit judges.

92. As of the year 1940, Missouri at no time sought in any court proceeding to protect the voting rights of any African American resident of Missouri; African American Missourians were actively restrained from even attending law school in Missouri (see *Gaines v. Canada*, United States Supreme Court- 1939), much less maintained any reasonable opportunity whatsoever to serve as a member of any Missouri judicial circuit appointment commission established by Article V, Section 29 of the Missouri Constitution, because the vast majority of appointees who were appointed to serve on any Missouri circuit judicial appointment committee were required to maintain a law degree pursuant to the requirements established by Article V, Section 29(d) of the Missouri Constitution, which was simply unattainable by the vast majority of African American residents of Missouri in 1940.

93. Proponents of Article V, Section 29(d) of the Missouri Constitution at the time (and currently) charged its enactment was necessary to establish a <u>nonpartisan</u> judicial appointment system in the City of St. Louis and Jackson County, which could have been resolved by Missouri enforcing (abet, the whole concept is an unconstitutional violation of the First Amendment) the language of Article V, Section 29(d) of the Missouri Constitution, which specifically prohibited any City of St. Louis or Jackson County circuit judge from maintaining any political party affiliation and nothing prohibited Missouri from holding nonpartisan

competitive elections for judiciary in the same manner as was conducted by Missouri with initiative petitions and other ballot questions in 1940.

94. Article V, Section 29(d) of the Missouri Constitution was not narrowly-tailored in a manner to address any purported state interest in conflict with the clear constitutional commands against Missouri pursuant to the Fourteenth and Fifteenth Amendments of the United States Constitution that would justify Missouri to establish a ballot judicial selection process which provides a disparate impact result where virtually ZERO African Americans can participate in the ballot selection of circuit judges serving their county community in the same manner as majority White communities in the State of Missouri, nor does any state interest exist that permits Missouri to allow the aforementioned disparate impact related to African Americans lack of participation in selecting circuit judges to serve their home Missouri judicial circuit.

95. 86 years after the original enactment of the Missouri Plan in the year 1940, under what is now Article V, Sections 25 of the Missouri Constitution, in the year 2026 eighty-eight percent (88%) of Missouri African Americans are still prohibited from voting for the Missouri circuit judge candidates of their choice to serve their home Missouri judicial circuit.

96. Today, one hundred percent (100%) of the African American voters who reside within Missouri Congressional District One are prohibited from voting for the Missouri circuit judge candidates of their choice to serve their home Missouri judicial circuit.

97. Neither Article V, Section 25 of the Missouri Constitution, or its predecessor Article V,

Section 29 of the Missouri Constitution, may result in a generational desperate impact against the ability of the vast majority of African American residents of Missouri the opportunity to elect the Missouri associate circuit judge and circuit judge candidates of their choice to serve as judges of their home Missouri judicial circuit.

98. Despite the unconstitutionality of state judicial elections within Missouri Congressional District One being conducted under the Missouri Plan, because judicial candidates within the Missouri Congressional District One who are subject to judicial retention ballot elections this November 2026 have not engaged in ANY primary election and there is less than ninety (90) days to the Missouri General election scheduled for November 3, 2026, with the minimum temporal period set by the Uniformed and Overseas Citizens Absentee Voting Act required for Missouri to conduct a contested Primary and General requiring ballots for each Primary and General election be mailed by the Missouri Secretary of State no later than 45 days prior to such Primary and General elections, which in the instant ninety (90) days prior to the 2026 Missouri General election does not exist, Plaintiff Berry charges that while declaratory and injunctive relief is immediately necessary against Missouri against the Missouri Plan for other reasons, **any such preliminary or final orders to such effect should NOT disturb any Missouri judicial retention election or its results involving Missouri Congressional District One voters during the 2026 Missouri General election**, regardless of the unconstitutionality of the Missouri Plan which stands in violation of the Voting Rights Act of 2006, the Fourteenth Amendment of the United States Constitution and the Fifteenth

Amendment of the United States Constitution.

**C. The 2022 Missouri Congressional District Map on its face violates the Voting Rights Act of 2006 and the Civil War Amendments.**

99. Plaintiff Berry charges that Missouri substantially violated Section One of the Fifteenth Amendment of the United States Constitution when Missoui drafted and enacted the 2022 Missouri Congressional District Map, because Missouri considered and utilized the race of African Americans in Eastern Missouri as a primary factor when drafting the jurisdictional boundaries of Missouri Congressional District One provided by the 2022 Missouri Congressional District Map, purportedly, incorrectly and unconstitutionally to comply with the Voting Rights Act.

100. At no time since Missouri has engaged in substantial transformation of the Missouri congressional district map, specifically, when in the year 2012 Missouri was required to reduce the number of Missouri congressional districts from nine (9) congressional districts to eight (8) congressional districts, has intentional racist discrimination been alleged, existed or properly considered by Missouri to permit the utilization the race of any Missourian to draft the jurisdictional boundaries of Missouri Congressional One in any manner permissible by the Voting Rights Act.

101. In regards to enacting Missouri congressional districts in the instant, Missouri's core compliance duty with the Voting Rights Act is simply not to effectuate racism by permitting the race of any Missourian to be utilized to enact United States congressional

districts in the manner that is required pursuant to Section One of the Fifteenth Amendment in order for Missouri to not become subject to Federal court enforcement action pursuant to the Voting Rights Act. and only when intentional racist discrimination been alleged and properly considered by Missouri may Missouri consider utilizing the Voting Rights Act as a constitutional remedy to any purported intentional racist discrimination related to any Missourian's right to vote being denied or otherwise abridged.

102. Missouri utilizing the race of any Missouri voter to draft and enact the 2022 Missouri Congressional District Map is a violation of the Fourteenth Amendment of the United States Constitution and Section One of the Fifteenth Amendment of the United States Constitution, which is subject to Plaintiff Berry's instant use of the Voting Rights Act to seek before the Court judicial prohibition against Missouri, unless Missouri can establish before the Court that a compelling state interest supported by a pre-enactment analysis existed which permitted Missouri to engage in establishing Missouri congressional districts utilizing race as a sword against intentional racial discrimination purported by Missouri to constitute such unconstitutional use of race as applied by Missouri constitutional and duly lawful.

103. Because the Fifteenth Amendment of the United States Constitution is limited to requiring the "vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude", any Federal law authorized pursuant to Section 2 of the Fifteenth Amendment of the United States Constitution, such as, Section 2 of the Voting Rights Act, are constitutionality-limited to enforcement against intentional

discriminatory election practices and policies which cause Missouri or the United States to deny or abridge the vote of any Missourian based upon their race.

104. While Plaintiff Berry believes Section 2 of the Voting Rights Act was enacted by the United States Congress as a private-action judicial remedy authorizing Federal court jurisdiction over any violation of the Fifteenth Amendment of the United States Constitution and was not intended to establish independent voting rights not established directly by the Fifteenth Amendment of the United States Constitution, Plaintiff Berry concedes that the majority of the United States Supreme Court has not directly adopted the aforementioned legal position (see Justice Thomas concurring opinion, *LOUISIANA v. CALLAIS ET AL.*) and suggests that any state may apply Section 2 of the Voting Rights Act when establishing United States congressional districts, provided such state has considered and adopted evidence that supports justifiable conclusions that intentional racial discrimination is currently causing United States congressional district voters to be denied or abridged by the United States or by any State the right to meaningfully vote on account of race, color, or previous condition of servitude.

105. The 2022 Missouri Congressional District Map was enacted on May 18, 2022, by Missouri utilizing the general legislative process of the Missouri General Assembly.

106. Under the general legislative process of the Missouri General Assembly, there are four methods to present evidence or testimony related to the enactment of any Missouri legislation, such as, the enactment of House Bill 2909, which including (a) presentation of

evidence before a public Missouri legislative committee, (b) live testimony before a public Missouri legislative committee, (c) submission of written testimony before a Missouri legislative committee or (d) evidence entered into the record of the Missouri legislative body by a Missouri legislator, which in the instant absolutely ZERO evidence was produced by the Missouri General Assembly that constitutes engagement in any pre-enactment analysis whatsoever prior to Missouri enacting Congressional District One upon the 2022 Missouri Congressional District Map as a majority-Minority United States Congressional District utilizing the race of Missouri voters.

107. Even if Missouri had engaged in any pre-enactment analysis prior to enacting Missouri Congressional District One as a "majority-Minority" United States Congressional District utilizing the race of Missouri voters upon the 2022 Missouri Congressional District Map, the failure by Missouri to enact legislative approval of any report. resolution or enactment by preamble to the 2022 Missouri Congressional District One Map acknowledging any pre-enactment analysis occurred, or the findings of such pre-enactment analysis thereof establishing justifiable conclusions, is fatal to the Federal constitutionality of the 2022 Missouri Congressional District One Map being drafted by Missouri utilizing race.

108. Missouri's failure to engage in any pre-enactment analysis prior to enacting Missouri Congressional District One as a "majority-Minority" United States Congressional District utilizing the race of Missouri voters upon the 2022 Missouri Congressional District Map automatically disqualifies Missouri from presenting to the Court any compelling state

interest as a defense against Plaintiff Berry's collateral attack of the unconstitutionality of the 2022 Missouri Congressional District Map.

109. Even if Missouri had properly performed any meaningful pre-enactment analysis with the issuance of a justifiable conclusions declaration or enactment attached to Missouri Legislation creating Missouri Congressional District One as a "majority-Minority" United States Congressional District utilizing the race of Missouri voters upon the 2022 Missouri Congressional District Map, Missouri is unable to sustain the constitutionality of the 2022 Missouri Congressional District Map under a *GINGLES* analysis, as amended by *LOUISIANA v. CALLAIS ET AL.*, which states:

> "(b) This interpretation does not require abandonment of the framework for evaluating § 2 claims that the Court established in Thornburg v. Gingles, 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25. The Court need only update the framework so it aligns with the statutory text and reflects important developments since the Court decided Gingles 40 years ago. Four historical developments are of particular note. First, vast social change has occurred throughout the country and particularly in the South, which have made great strides in ending entrenched racial discrimination. Second, a full-blown two-party system has emerged in the States where § 2 suits are most common, and there is frequently a correlation between race and party preference. Third, in Rucho v. Common Cause, 588 U.S. 684, 139 S.Ct. 2484, 204 L.Ed.2d 931, this Court held that partisan gerrymandering claims are not justiciable in federal court, and this holding creates an incentive for litigants to exploit § 2 for partisan purposes by "repackag[ing] a partisan-gerrymandering claim as a racial-gerrymandering claim," Alexander v. South Carolina State Conference of the NAACP, 602 U.S. 1, 21, 144 S.Ct. 1221, 218 L.Ed.2d 512. Fourth, the increased use and capabilities of computers in drawing districts and creating illustrative maps means that a § 2 plaintiff can easily identify an alternative map that fully achieves all the State's legitimate goals while producing greater racial balance, if such a map is possible. In light of these developments, the Court updates the Gingles framework and realigns it with the text of § 2 and constitutional principles. Pp. 1157-1160.
>
> (1) The first Gingles precondition is that a community of minority voters must be sufficiently numerous and compact to constitute a majority in a reasonably configured district. While many § 2 plaintiffs have simply provided illustrative maps with their

desired number of majority-minority districts, such maps prove only that the State could create an additional majority-minority district, not that the State's failure to do so violated § 2 of the Voting 1141*1141 Rights Act. To show the latter, plaintiffs' illustrative maps must satisfy two conditions: Plaintiffs cannot use race as a districting criterion in drawing illustrative maps, and illustrative maps must meet all the State's legitimate districting objectives, including traditional districting criteria and the State's specified political goals. Pp. 1159-1160.

(2) To satisfy the second and third preconditions—politically cohesive voting by the minority and racial-bloc voting by the majority—the plaintiffs must provide an analysis that controls for party affiliation, showing that voters engage in racial-bloc voting that cannot be explained by partisan affiliation. Pp. 1159-1160.

(3) On the "totality of circumstances" inquiry, the focus must be on evidence that has more than a remote bearing on what the Fifteenth Amendment prohibits: present-day intentional racial discrimination regarding voting. Discrimination that occurred some time ago and present-day disparities characterized as ongoing "effects of societal discrimination" are entitled to much less weight. Shaw v. Hunt, 517 U.S. 899, 909-910, 116 S.Ct. 1894, 135 L.Ed.2d 207. Pp. 1180-1181."

110. Missouri's use of the Voting Rights Act as a predicate to enact the 2022 Missouri Congressional District Map under a *GINGLES* analysis fails the first precondition because Missouri was prohibited from utilizing race to create the jurisdictional boundaries of Missouri Congressional District One provided by the 2022 Missouri Congressional District Map pursuant to the Voting Rights Act without actually enacting Missouri Congressional District One with a majority of African Americans residents or voters, or in the alternative, a majority of minorities who vote as a racial block. (see *Bartlett v. Strickland*, 556 US 1 - Supreme Court 2009)

111. The 2022 Missouri Congressional District Map under a *GINGLES* analysis fails the first precondition because the purported authority for Missouri to utilize race to create the jurisdictional boundaries of Missouri Congressional District One provided by the 2022

Missouri Congressional District Map pursuant to the Voting Rights Act does NOT extend to creating any "influence district", which provides for the creation of a congressional district based upon the race of voters that does not result in enacting Missouri Congressional District One with (a) a majority of African American voters or residents or (b) a majority of minority voters who are shown to vote as a minority racial block. (see *Bartlett v. Strickland*)

112. The 2022 Missouri Congressional District Map under a *GINGLES* analysis fails the second and third preconditions because the African American voters in Missouri Congressional District One do not vote as a racial voter block in a manner that can't be explained as simply Democrat partisan voting patterns and not voting as a racial voter block.

113. While countywide political candidates are not subject to the formation of majority-Minoritty county jurisdictions pursuant to the Voting Rights Act, consideration of the totality of the circumstances regarding Missouri's use of race to draft and enact the boundaries Missouri Congressional District One permits the consideration as to whether African Americans in St. Louis County votes as a racial block.

114. At all relevant temporal periods, St. Louis County's African American population is approximately twenty-five percent (25%) of St. Louis County's population; an analysis of voting trends in St. Louis County of African American countywide political candidates Charlie Dooley, Wesley Bell and Paul Berry III with White countywide political candidates Steve Stegner, Sam Page and Melissa Price, which establishes an extraordinary number of White voters voted for African American political candidates and White candidates received

more votes from African American voters than White voters in other instances.

115. Evidence that African Americans do not vote as a racial voter block in Missouri Congressional District One is evident from the 2025 Democrat Primary results for City of St. Louis Mayor and 2026 Democrat Primary election results for St. Louis County Executive.

116. The totality of the circumstance analysis under *GINGLES* requires consideration as to whether any intentional racial discrimination related to African Americans voters in Missouri Congressional District One being denied the ability to vote as a racial voter block or the 2022 Missouri Congressional District Map resolving a charge of intentional racial discrimination, and even under circumstantial evidentiary consideration, no evidence exist that suggests that African Americans voters in Missouri Congressional District One at any effective time before enactment, at the time of enactment or after enactment of the 2022 Missouri Congressional District Map suffered the inability to vote unencumbered as a racial voter block or did the 2022 Missouri Congressional District Map resolve any intentional racial discrimination charge related to African Americans voters in Missouri Congressional District One.

117. Missouri Congressional District One has been represented by an African American United States congressional representative for the last 58 years, since 1968 until the date of this Complaint.

118. During the 21st Century, there has not been a single claim involving any local or state legislative district within or adjacent to Missouri Congressional District One that

international racial discrimination caused any African American the inability to elect the political candidate of their choice or otherwise abridged the vote of African Americans within or adjacent to Missouri Congressional District One.

119. Under reasonable belief, no White candidate has won any local or state legislative district Primary or General election within Missouri Congressional District One in recent times.

120. In order for Missouri to utilize race to establish any Missouri Congressional District by utilizing the race of voters, Missouri must prove that a compelling state interest exists to permit Missouri's clear violation of Section One of the Fourteenth Amendment and Section One of the Fifteenth Amendment by utilizing race to enact the 2022 Missouri Congressional District Map, to which, Missouri is unable to produce any compelling state interest existed which permitted Missouri to utilize race to draft and enact the 2022 Missouri Congressional District Map.

121. Missouri has operated under a false premise when drafting the 2022 Missouri Congressional District Map that Section 2 of the Voting Rights Act, in itself, provided Missouri the authority to racially gerrymander its United States congressional districts solely based upon Missouri's assumed compliance with the Voting Rights Act, which has already been found when committed by other States within the Union as unconstitutional by the Federal Courts.

122. Loosely and informally espousing the need to comply with the requirements of Section 2 of the Voting Rights Act, in itself, does not provide a compelling state interest for

Missouri to violate the United States Constitution by utilizing the race of Missouri voters to draft the 2022 Missouri Congressional District Map, Missouri is required to conduct a pre-enactment analysis with justifiable conclusions prior to invoking Section 2 of the Voting Rights Act to utilize race to establish Missouri Congressional District One as provided upon the 2022 Missouri Congressional District Map.

123. The Black population migrates outside of the boundaries of the First Congressional District seeking different community interests than provided within the First Congressional District related to government services, employment opportunities, housing opportunities, educational opportunities and criminal justice services, all influenceable by Federal congressional appropriations and representation.

124. Because both the Democrat Party and Republican Party nominee for the 2026 Missouri General congressional elections are each African American, African Americans in the St. Louis region is not in jeopardy of being represented by a Congressman who is not African American.

125. The Court should declare and strike the 2022 Missouri Congressional District Map as in violation of the Voting Rights Act of 2006 and as unconstitutional pursuant to Section One of the Fourteenth Amendment and Section One of the Fifteenth Amendment.

**Enactment of a Constitutional Missouri Congressional District Map to Replace the Unconstitutional Missouri Congressional District Maps is Feasible**

126. Plaintiff Berry is required to present a proposed Missouri congressional district map that would cure the constitutional deficiencies presented by the unconstitutional 2022 Missouri

Congressional District Map. (see *THORNBURG V. GINGLES*, 478 U. S. 30, as amended by *LOUISIANA v. CALLAIS ET AL.*)

127. Plaintiff Berry contends that any Missouri congressional district map that does not use race as a main factor when drafting congressional boundaries and is otherwise "composed of contiguous territory as compact and as nearly equal in population as may be" provides a Missouri congressional district map that cures the constitutional deficiencies presented by the unconstitutional Missouri Congressional District Maps in question.

128. Plaintiff Berry presents the following Missouri congressional district map that was not drafted utilizing race when drafting congressional boundaries and is otherwise "composed of contiguous territory as compact and as nearly equal in population as may be", which provides a Missouri congressional district map that cures the constitutional deficiencies presented by the unconstitutional Missouri Congressional District Maps in question as "Attachment A".

129. While Plaintiff Berry's proposed constitutional Missouri Congressional District Map was not drafted utilizing the race of any Missourian, in the relief requested by Plaintiff Berry to be provided by Missouri, Plaintiff Berry seeks the Court to require Missouri to desegregate African Americans voters in the St. Louis region who have been unconstitutionally racially gerrymandered within the First Congressional District of Missouri with the rest of Missouri congressional voters upon any new Missouri congressional district map approved by this Honorable Court.

**Remedies to Unconstitutionality and Voidness of Gerrymandered Missouri Congressional District Maps**

130. With the Missouri Congressional District Maps both being void and unenforceable Missouri statutes during the temporal period prior to the 2026 Missouri General congressional election, Missouri is required to immediately enact a new Missouri congressional district map for use during the 2026 Missouri General congressional election, preferably prior to September 8, 2026.

131. Plaintiff Berry calls the Court to consider by separate motion temporary and preliminary injunctive relief against Missouri prohibiting the use of the Missouri Congressional District Maps for use during the 2026 Missouri General congressional election.

132. The Purcell Principle should not be applied in the underlying matter before the Court, because the Federal judicial relief requested in the underlying matter does not cause the Court to substantially interfere with Missouri's own application of its state election law and the statutory temporal period for Missouri to perform functions to conduct the election in question are not substantially disturbed.

133. Plaintiff Berry contends while the Court would be well within its authority to instantly order its own drafting of a new Missouri congressional district map under consideration of the underlying factual and temporal circumstances, Plaintiff Berry strenuously contends Federal case law supports the Court's judicial restraint in favor of providing Missouri the first opportunity to answer the Missouri congressional district formation political question

under the proper constitutional requirements by enacting a new Missouri congressional district map to cure its unconstitutional use of the Missouri Congressional District Maps for use during the 2026 Missouri General congressional election prior to September 8, 2026.

134. Missouri has shown the ability to enact a new Missouri congressional district map within six (6) calendar days of a special session being called to commence by the Missouri Governor. (see Complaint, paragraphs 28-32)

135. To provide Missouri time to enact a new Missouri congressional district map by September 19, 2026, Plaintiff Berry requests by separate motion before the Court to shorten time for all filings, discovery, hearings and trial in the underlying matter before the appointed three-Judge Court.

136. Unrelated to the relief requested by Plaintiff Berry before this Court, the passage of a new Missouri congressional district map would supercede and replace Missouri House Bill 1 regardless of the affirmative or negative vote upon the Missouri House Bill 1 Referendum, and as such, Plaintiff Berry strongly suggests the Court issue a swift decision in the underlying matter to provide time for the Missouri Secretary of State prior to September 19, 2026, to petition the Missouri courts as to whether the mootness of the vote results of the Missouri House Bill 1 Referendum, or the cost to Missouri taxpayers to conduct any election upon the Missouri House Bill 1 Referendum due to the mootness of such election vote results, establishes cause for the Missouri Secretary of State to petition the Missouri courts to cancel the ballot election upon the Missouri House Bill 1 Referendum.

**Noncompliance with Proposed Federal Court Order**

137. In the somber event that Missouri does not enact a new Missouri congressional district map by 5:00pm on September 8, 2026, this Honorable Court should immediately approve the congressional district map attached to this Complaint for use during the 2026 Missouri General congressional election, as any failure by Missouri to enact a new Missouri congressional district map by 5:00pm on September 8, 2026, shall clearly violate each of the aforementioned Missouri and Federal law and constitutional provisions.

138. The "hard deck" deadline to resolve the underlying legal matter is set by the Uniformed and Overseas Citizens Absentee Voting Act (52 U.S.C. §§20301-20311), which requires Missouri to mail 2026 Missouri General election congressional ballots to United States Armed Forces uniformed members no later than Saturday September 19, 2026, minus any time required by Missouri to prepare and print 2026 Missouri General election congressional ballots for mailing to United States Armed Forces uniformed members.

**COUNT I.**
**THE MISSOURI PLAN ACT VIOLATES THE VOTING RIGHTS ACT OF 2006**

139. Each of the above paragraphs are hereby incorporated by reference as if set forth fully herein.

140. Upon original implementation in the year 1940, as applied the Missouri Plan prohibited residents of certain Missouri counties from participation in ballot elections to nominate and elect the judiciary serving their Missouri county, which consisted of ninety-nine percent (99%) of the African American population in Missouri, while similarly situated

Missouri counties with predominantly White populations were permitted to nominate and elect the judiciary serving their Missouri county and judicial circuit.

141. As applied today 86 years after the original enactment of the Missouri Plan Act, the Missouri Plan Act prohibits residents of certain Missouri counties from participation in ballot elections to nominate and elect the judiciary serving their Missouri county, which currently consist of eighty-eight percent (88%) of African American population in Missouri, while similarly similarly situated Missouri counties with predominantly White populations are permitted to nominate and elect the judiciary serving their Missouri county.

142. Today, one hundred percent (100%) of the African American population in Missouri Congressional District One are prohibited by the Missouri Plan Act to elect the Missouri associate circuit judge and circuit judge serving their Missouri county.

143. Article V, Section 25(d) of the Missouri Constitution was not narrowly-tailored in a manner to address any purported state interest in conflict with the clear constitutional commands against Missouri pursuant to the Fourteenth and Fifteenth Amendments of the United States Constitution that would justify Missouri to establish a ballot judicial selection process which provides a disparate impact result where the vast plurality of African Americans are prohibited from participation in the ballot selection of circuit judges serving their county community in the same manner as majority White communities in the State of Missouri, nor does any state interest exist that permits Missouri to allow the aforementioned disparate impact related to African Americans lack of participation in selecting circuit judges to serve their

home Missouri judicial circuit.

144. **Plaintiff Berry charges that while declaratory and injunctive relief is immediately necessary against Missouri's unconstitutional use of the Missouri Plan Act for other reasons, any such preliminary or final orders to such effect should NOT disturb any Missouri judicial retention election or its results involving Missouri Congressional District One voters during the 2026 Missouri General election, regardless of the unconstitutionality of the Missouri Plan which stands in violation of the Voting Rights Act of 2006.**

145. The Missouri Plan Act not establishing a uniform judicial selection process for all Missourians establishing a desperate impact regarding the voting rights of African Americans residing in Missouri does not survive a strict scrutiny or *Gingles* analysis as provided by Federal case law.

146. The Court should declare the Missouri Plan Act not establishing a uniform Missouri associate circuit judge or circuit judge selection process for all Missourians is unlawful pursuant to the Voting Rights Act of 2006 and enjoin Missouri from conducting any associate circuit judge or circuit judge election within the current Missouri Congressional District boundaries after the 2026 Missouri General election to the extent that does not provide for a uniform judicial selection process for all Missourians.

147. Plaintiff Berry is entitled to the requested relief on Count I.

**COUNT II.**

## THE MISSOURI PLAN ACT VIOLATES SECTION ONE OF THE FOURTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION

148. Each of the above paragraphs are hereby incorporated by reference as if set forth fully herein.

149. Upon original implementation in the year 1940, as applied the Missouri Plan prohibited residents of certain Missouri counties from participation in ballot elections to nominate and elect the judiciary serving their Missouri county, which consisted of ninety-nine percent (99%) of the African American population in Missouri, while similarly situated Missouri counties with predominantly White populations were permitted to nominate and elect the judiciary serving their Missouri county and judicial circuit.

150. As applied today 86 years after the original enactment of the Missouri Plan Act, the Missouri Plan Act prohibits residents of certain Missouri counties from participation in ballot elections to nominate and elect the judiciary serving their Missouri county, which currently consist of eighty-eight percent (88%) of African American population in Missouri, while similarly similarly situated Missouri counties with predominantly White populations are permitted to nominate and elect the judiciary serving their Missouri county.

151. Today, one hundred percent (100%) of the African American population in Missouri Congressional District One are prohibited by the Missouri Plan Act to elect the Missouri associate circuit judge and circuit judge serving their Missouri county.

152. Article V, Section 25(d) of the Missouri Constitution was not narrowly-tailored in a manner to address any purported state interest in conflict with the clear constitutional

commands against Missouri pursuant to the Fourteenth and Fifteenth Amendments of the United States Constitution that would justify Missouri to establish a ballot judicial selection process which provides a disparate impact result where the vast plurality of African Americans are prohibited from participation in the ballot selection of circuit judges serving their county community in the same manner as majority White communities in the State of Missouri, nor does any state interest exist that permits Missouri to allow the aforementioned disparate impact related to African Americans lack of participation in selecting circuit judges to serve their home Missouri judicial circuit.

153. **Plaintiff Berry charges that while declaratory and injunctive relief is immediately necessary against Missouri's unconstitutional use of the Missouri Plan Act for other reasons, any such preliminary or final orders to such effect should NOT disturb any Missouri judicial retention election or its results involving Missouri Congressional District One voters during the 2026 Missouri General election, regardless of the unconstitutionality of the Missouri Plan which stands in violation of the Voting Rights Act of 2006.**

154. The Missouri Plan Act not establishing a uniform judicial selection process for all Missourians establishing a desperate impact regarding the voting rights of African Americans residing in Missouri does not survive a strict scrutiny analysis as provided by Federal case law.

155. The Court should declare the Missouri Plan Act not establishing a uniform Missouri associate circuit judge or circuit judge selection process for all Missourians is unlawful

pursuant to the Fourteenth Amendment of the United States Constitution and enjoin Missouri from conducting any associate circuit judge or circuit judge election within the current Missouri Congressional District boundaries after the 2026 Missouri General election to the extent that does not provide for a uniform judicial selection process for all Missourians.

156. Plaintiff Berry is entitled to the requested relief on Count II.

**COUNT III.**
**THE MISSOURI PLAN ACT VIOLATES SECTION ONE OF THE FIFTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION**

157. Each of the above paragraphs are hereby incorporated by reference as if set forth fully herein.

158. Upon original implementation in the year 1940, as applied the Missouri Plan prohibited residents of certain Missouri counties from participation in ballot elections to nominate and elect the judiciary serving their Missouri county, which consisted of ninety-nine percent (99%) of the African American population in Missouri, while similarly situated Missouri counties with predominantly White populations were permitted to nominate and elect the judiciary serving their Missouri county and judicial circuit.

159. As applied today 86 years after the original enactment of the Missouri Plan Act, the Missouri Plan Act prohibits residents of certain Missouri counties from participation in ballot elections to nominate and elect the judiciary serving their Missouri county, which currently consist of eighty-eight percent (88%) of African American population in Missouri, while similarly similarly situated Missouri counties with predominantly White populations are

permitted to nominate and elect the judiciary serving their Missouri county.

160. Today, one hundred percent (100%) of the African American population in Missouri Congressional District One are prohibited by the Missouri Plan Act to elect the Missouri associate circuit judge and circuit judge serving their Missouri county.

161. Article V, Section 25(d) of the Missouri Constitution was not narrowly-tailored in a manner to address any purported state interest in conflict with the clear constitutional commands against Missouri pursuant to the Fourteenth and Fifteenth Amendments of the United States Constitution that would justify Missouri to establish a ballot judicial selection process which provides a disparate impact result where the vast plurality of African Americans are prohibited from participation in the ballot selection of circuit judges serving their county community in the same manner as majority White communities in the State of Missouri, nor does any state interest exist that permits Missouri to allow the aforementioned disparate impact related to African Americans lack of participation in selecting circuit judges to serve their home Missouri judicial circuit.

162. **Plaintiff Berry charges that while declaratory and injunctive relief is immediately necessary against Missouri's unconstitutional use of the Missouri Plan Act for other reasons, any such preliminary or final orders to such effect should NOT disturb any Missouri judicial retention election or its results involving Missouri Congressional District One voters during the 2026 Missouri General election, regardless of the unconstitutionality of the Missouri Plan which stands in violation of the Voting Rights**

**Act of 2006.**

163. The Missouri Plan Act not establishing a uniform judicial selection process for all Missourians establishing a desperate impact regarding the voting rights of African Americans residing in Missouri does not survive a strict scrutiny or analysis as provided by Federal case law.

164. The Court should declare the Missouri Plan Act not establishing a uniform Missouri associate circuit judge or circuit judge selection process for all Missourians is unlawful pursuant to the Fifteenth Amendment of the United States Constitution and enjoin Missouri from conducting any associate circuit judge or circuit judge election within the current Missouri Congressional District boundaries after the 2026 Missouri General election to the extent that does not provide for a uniform judicial selection process for all Missourians.

165. Plaintiff Berry is entitled to the requested relief on Count III.

**COUNT IV.**
**THE 2022 MISSOURI CONGRESSIONAL DISTRICT MAP VIOLATES THE VOTING RIGHTS ACT OF 2006**

166. Each of the above paragraphs are hereby incorporated by reference as if set forth fully herein.

167. Missouri intentionally utilized race to draft the congressional boundaries of Missouri Congressional District One when enacting the 2022 Missouri Congressional District Map.

168. The Voting Rights Act of 2006 prohibits Missouri from utilizing race to draft the

congressional boundaries of Missouri Congressional District One when enacting the 2022 Missouri Congressional District Map, which states:

> "(2) No person acting under color of law shall—
>
> (A) in determining whether any individual is qualified under State law or laws to vote in any election, apply any standard, practice, or procedure different ' from the standards, practices, or procedures applied under such law or laws to other individuals within the same county, parish, or similar political subdivision who have been found by State officials to be qualified to vote;"

169. Missouri established the congressional boundaries of Missouri Congressional District One when enacting the 2022 Missouri Congressional District Map in a manner that created Missouri Congressional District One as a "racial influence district" impermissible by the Voting Rights Act of 2006.

170. Missouri was forbidden from utilizing the race of any Missourian to draft the congressional boundaries of Missouri Congressional District One when enacting the 2022 Missouri Congressional District Map, unless Missouri can allege and prove (a) <u>any allegation or evidence existed</u> whatsoever <u>suggesting intentional racial discrimination</u> related to minorities voting within or adjacent to the congressional boundaries of Missouri Congressional District One, (c) <u>pre-enactment analysis conducted by the Missouri General Assembly of any such allegation or evidence</u> suggesting intentional racial discrimination related to minorities voting within or adjacent to the congressional boundaries of Missouri Congressional District One which was considered by the Missouri General Assembly prior to utilizing race to draft the congressional boundaries of Missouri Congressional District One when enacting the 2022

Missouri Congressional District Map, (d) acknowledgement of any pre-enactment analysis conducted by the Missouri General Assembly prior to utilizing race to draft the congressional boundaries of Missouri Congressional District One when enacting the 2022 Missouri Congressional District Map by a vote of the Missouri General Assembly upon a report, hearing finding or preamble to such effect attached or incorporated with the Missouri legislation enacting the 2022 Missouri Congressional District Map, which in the instant was not performed by Missouri in any manner to permit Missouri to utilize race to draft the congressional boundaries of Missouri Congressional District One when enacting the 2022 Missouri Congressional District Map.

171. Missouri's intentional discriminatory conduct by utilizing race to draft the congressional boundaries of Missouri Congressional District when enacting the 2022 Missouri Congressional District Map does not survive a strict scrutiny or *Gingles* analysis as provided by Federal case law.

172. The Court should declare the 2022 Missouri Congressional District Map as unlawful pursuant to the Voting Rights Act of 2006 and enjoin Missouri Secretary of State from utilizing the 2022 Missouri Congressional District Map to conduct the 2026 Missouri General congressional election.

173. Plaintiff Berry is entitled to the requested relief on Count IV.

**COUNT V.**

**THE 2022 MISSOURI CONGRESSIONAL DISTRICT MAP VIOLATES SECTION ONE OF THE FOURTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION**

174. Each of the above paragraphs are hereby incorporated by reference as if set forth fully herein.

175. Missouri intentionally utilized race to draft the congressional boundaries of Missouri Congressional District One when enacting the 2022 Missouri Congressional District Map.

176. Section One of the Fourteenth Amendment of the United States Constitution prohibits Missouri from utilizing race to draft the congressional boundaries of Missouri Congressional District One when enacting the 2022 Missouri Congressional District Map, which states:

> "Section 1: All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

177. Missouri was forbidden from utilizing the race of any Missourian to draft the congressional boundaries of Missouri Congressional District One when enacting the 2022 Missouri Congressional District Map, unless Missouri can allege and prove (a) any allegation or evidence existed whatsoever suggesting intentional racial discrimination related to minorities voting within or adjacent to the congressional boundaries of Missouri Congressional District One, (c) pre-enactment analysis conducted by the Missouri General Assembly of any such allegation or evidence suggesting intentional racial discrimination related to minorities voting within or adjacent to the congressional boundaries of Missouri Congressional District

One which was considered by the Missouri General Assembly prior to utilizing race to draft the congressional boundaries of Missouri Congressional District One when enacting the 2022 Missouri Congressional District Map, (d) acknowledgement of any pre-enactment analysis conducted by the Missouri General Assembly prior to utilizing race to draft the congressional boundaries of Missouri Congressional District One when enacting the 2022 Missouri Congressional District Map by a vote of the Missouri General Assembly upon a report, hearing finding or preamble to such effect attached or incorporated with the Missouri legislation enacting the 2022 Missouri Congressional District Map, which in the instant was not performed by Missouri in any manner to permit Missouri to utilize race to draft the congressional boundaries of Missouri Congressional District One when enacting the 2022 Missouri Congressional District Map.

178. Missouri's intentional discriminatory conduct by utilizing race to draft the congressional boundaries of Missouri Congressional District when enacting the 2022 Missouri Congressional District Map does not survive a strict scrutiny analysis as provided by Federal case law.

179. The Court should declare the 2022 Missouri Congressional District Map as unconstitutional pursuant to Section One of the Fourteenth Amendment of the United States Constitution and enjoin Missouri Secretary of State from utilizing the 2022 Missouri Congressional District Map to conduct the 2026 Missouri General congressional election.

180. Plaintiff Berry is entitled to the requested relief on Count V.

**COUNT VI.**
**THE 2022 MISSOURI CONGRESSIONAL DISTRICT MAP VIOLATES SECTION ONE OF THE FIFTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION**

181. Each of the above paragraphs are hereby incorporated by reference as if set forth fully herein.

182. Missouri intentionally utilized race to draft the congressional boundaries of Missouri Congressional District One when enacting the 2022 Missouri Congressional District Map.

183. Section One of the Fifteenth Amendment of the United States Constitution prohibits Missouri from utilizing race to draft the congressional boundaries of Missouri Congressional District One when enacting the 2022 Missouri Congressional District Map, which states:

> "The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude."

184. Missouri was forbidden from utilizing the race of any Missourian to draft the congressional boundaries of Missouri Congressional District One when enacting the 2022 Missouri Congressional District Map, unless Missouri can allege and prove (a) any allegation or evidence existed whatsoever suggesting intentional racial discrimination related to minorities voting within or adjacent to the congressional boundaries of Missouri Congressional District One, (c) pre-enactment analysis conducted by the Missouri General Assembly of any

such allegation or evidence suggesting intentional racial discrimination related to minorities voting within or adjacent to the congressional boundaries of Missouri Congressional District One which was considered by the Missouri General Assembly prior to utilizing race to draft the congressional boundaries of Missouri Congressional District One when enacting the 2022 Missouri Congressional District Map, (d) acknowledgement of any pre-enactment analysis conducted by the Missouri General Assembly prior to utilizing race to draft the congressional boundaries of Missouri Congressional District One when enacting the 2022 Missouri Congressional District Map by a vote of the Missouri General Assembly upon a report, hearing finding or preamble to such effect attached or incorporated with the Missouri legislation enacting the 2022 Missouri Congressional District Map, which in the instant was not performed by Missouri in any manner to permit Missouri to utilize race to draft the congressional boundaries of Missouri Congressional District One when enacting the 2022 Missouri Congressional District Map.

185. Missouri's intentional discriminatory conduct by utilizing race to draft the congressional boundaries of Missouri Congressional District when enacting the 2022 Missouri Congressional District Map does not survive a strict scrutiny analysis as provided by Federal case law.

186. The Court should declare the 2022 Missouri Congressional District Map as unconstitutional pursuant to Section One of the Fifteenth Amendment of the United States Constitution and enjoin Missouri Secretary of State from utilizing the 2022 Missouri

Congressional District Map to conduct the 2026 Missouri General congressional election.

187. Plaintiff Berry is entitled to the requested relief on Count VI.

**COUNT VII.**
**THE 2022 MISSOURI CONGRESSIONAL DISTRICT MAP VIOLATES SECTION ONE OF THE FIFTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION**

188. Each of the above paragraphs

189. Article I, Section 4, Clause 1 of the United States Constitution (the "Elections Clause"), grants each State within the Union, such as the State of Missouri, the authority to set "(t)he Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators."

190. Authorized by the Elections Clause, 2 U.S.C. § 7 requires Missouri and all other States of the Union to conduct a General election for United States Congress on the "Tuesday next after the 1st Monday in November, in every even numbered year."

191. 2 U.S.C. § 7 requires Missouri to conduct a General election for United States Congress on Tuesday November 3, 2026.

192. Authorized by the Elections Clause, 2 U.S.C. § 2c requires Missouri after "the Ninety-first Congress or in any subsequent Congress thereafter to more than one Representative under an apportionment made pursuant to the provisions of section 2a(a) of this title, there shall be established by law a number of districts equal to the number of Representatives to which such State is so entitled, and Representatives shall be elected only

from districts so established, no district to elect more than one Representative (except that a State which is entitled to more than one Representative and which has in all previous elections elected its Representatives at Large may elect its Representatives at Large to the Ninety-first 5 Congress)."

193. 2 U.S.C. § 2c requires Missouri to create a congressional district map for use during the 2026 Missouri General congressional election by establishing "by law a number of districts equal to the number of Representatives to which such State is so entitled, and Representatives shall be elected only from districts so established".

194. Authorized by the Elections Clause, 2 U.S. Code § 2a establishes the process for the United States to appoint the number of congressional districts Missouri is required to maintain upon Missouri's current congressional district map codified by Missouri law.

195. Authorized by the Elections Clause, Article III, Section 45 of the Missouri Constitution requires Missouri to create a congressional district map for use during the Missouri 2026 General election and states: "Congressional apportionment. — When the number of representatives to which the state is entitled in the House of the Congress of the United States under the census of 1950 and each census thereafter is certified to the governor, the general assembly shall by law divide the state into districts corresponding with the number of representatives to which it is entitled, which districts shall be composed of contiguous territory as compact and as nearly equal in population as may be."

196. United States congressional districts in Missouri are enacted by "the general

assembly shall by law divide the state into districts corresponding with the number of representatives to which it is entitled..", in the same general manner and under the same legislative procedure as enacting any other Missouri statute.

197. Both the Elections Clause and the Supremacy Clause provide that Article III, Section 45 of the Missouri Constitution, 2 U.S. Code § 2a, and 2 U.S. Code § 2c require Missouri to provide a lawfully enacted Missouri congressional district map to conduct the 2026 Missouri General congressional election, to which, Missouri has failed to enact or maintain in violation of Article III, Section 45 of the Missouri Constitution, 2 U.S. Code § 2a, 2 U.S. Code § 2c and the Elections Clause.

198. This Complaint was filed within two (2) court hours of Missouri by administrative process changing the Missouri congressional district map to be utilized to conduct the 2026 Missouri General congressional election as a function of Missouri election law declared permissible by the Missouri Supreme Court, which occurred after 4:00pm on August 3, 2026.

199. The *Purcell Principle* should not be applied when the function of changing the Missouri congressional district map requested by Plaintiff Berry before the Missouri state court does not expire until September 8, 2026, and to apply the *Purcell Principle* to the instant Complaint would obliterate the United States Congress' express intention that Plaintiff Berry be permitted more than two (2) court hours to challenge a racially unconstitutional map enacted by Missouri pursuant to 28 U.S.C. § 2284(a).

200. Missouri has shown the ability to enact a new Missouri congressional district map

within six (6) calendar days of a special session being called to commence by the Missouri Governor. (see Complaint, paragraphs 28-32)

201. Missouri's failure to maintain any lawfully enacted Missouri congressional district map to conduct the 2026 Missouri General congressional election after 5:00pm on September 8, 2026, causes Missouri to become in default of Article III, Section 45 of the Missouri Constitution, 2 U.S. Code § 2a, 2 U.S. Code § 2c and the Elections Clause, and the Court's remedies to such default is to either provide Missouri a brief opportunity to enact a lawful Missouri congressional district map or the Court should after a hearing on its constitutionality under Missouri and Federal law, approve Plaintiff Berry's proposed Missouri congressional district map for use during the 2026 Missouri General congressional election.

## PRAYER FOR RELIEF

WHEREFORE Plaintiff Berry prays that this Honorable Court:

A. Pursuant to 28 U.S.C. § 2284(b)(1) "immediately notify the chief judge of the circuit, who shall designate two other judges" so that "[t]he judges so designated, and the judge to whom the request was presented, shall serve as members of the court to hear and determine the action or proceeding";

B. Issue a declaratory judgment declaring the Missouri 2022 Congressional District Map violates Section 2 of the Voting Rights Act;

C. Issue a declaratory judgment declaring the Missouri 2022 Congressional District Map violates the Fourteenth Amendment of the United States Constitution;

D. Issue a declaratory judgment declaring the Missouri 2022 Congressional District Map violates the Fifteenth Amendment of the United States Constitution;

E. Issue injunctive relief prohibiting Missouri from utilizing the Missouri 2022 Congressional District Map to conduct the Missouri 2026 Congressional General Election or any other Missouri congressional election;

F. Issue injunctive relief requiring the Missouri General Assembly to draft and enact a new Missouri congressional district map for use by Missouri to conduct the Missouri 2026 Congressional General election; and

G. All fees and costs which are recoverable by Plaintiff Berry under 42 U.S.C.§ 1988.

Respectfully Submitted,

Paul Berry III
Plaintiff, Pro Se
1200 S. Big Bend Blvd.
St. Louis, Missouri 63117
314-755-9252
PBIIIUSA@gmail.com

## VERIFICATION

I have reviewed each fact and allegation of this Complaint and attest to personal knowledge of each fact and allegation as being correct and true to the best of my belief, knowledge and understanding.

Paul Berry III
Plaintiff

Sworn and subscribed before me on September 4, 2026, executed by Paul Berry III.

SCOTT A. CAMPBELL
Notary Public - Notary Seal
STATE OF MISSOURI
St. Charles County
My Commission Expires: Aug. 2, 2028
Commission # 12393920

Notary Public